## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| WILLIAM E. ALTON, III | * | |
| Plaintiff | * | |
| v | * | Civil Action No. WMN-15-804 |
| MARYLAND DEPT. OF PUBLIC SAFETY, *et al. | * | |
| | * | |
| Defendants | | |

*** 

## MEMORANDUM

Pending in the above-entitled civil rights action is Defendants' Motion to Dismiss or for Summary Judgment. ECF 20. Plaintiff opposes the motion. ECF 26 and 27. The Court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2014). Because Defendants have failed to address the claims fairly raised, the motion, construed as a Motion for Summary Judgment, shall be granted in part and denied in part without prejudice.

### Background

Plaintiff William E. Alton, III ("Alton"), a former prisoner in the Maryland Department of Public Safety and Correctional Services ("DPSCS"), filed the instant complaint on March 19, 2015, together with a Motion for Injunctive Relief. On May 5, 2015, this Court denied Alton's request for injunctive relief as moot. ECF 9.

The complaint generally concerns Alton's claim that, as a disabled inmate, he was denied the same programming and opportunities as other non-disabled inmates. In his complaint, Alton alleges that on March 20, 2014, he was transferred to the Dorsey Run Correctional Facility ("DRCF") in Jessup, Maryland, which is a pre-release unit. He claims that the Addictions Treatment Protocol ("ATP") programming was not available at DRCF, describes his stay as

"brief", and states he was assigned to the dietary job bank where he received blood-spill certification training. ECF 1 at p. 2.

Alton claims that Case Managers Ramsay and Elmore are "partially responsible" for the "injury suffered" by Alton because they knew or should have known that ATP was a mandatory requirement under DPSCS policy and that it was unavailable at DRCF. Alton adds that he was unable to earn good conduct credits while housed at DRCF and was required to wait "several days" before being classified to a job assignment. He further contends he was "denied the normal opportunity to work and learn valuable trade skills" like the other prisoners confined to DRCF. ECF 1 at pp. 2 – 3.

On April 14, 2014, Alton filed a complaint pursuant to the prison administrative remedy procedure ("ARP") asserting that Officer L. Allen wrote false notices of infraction against inmates and threatened them based solely on the fact that "they (we) were convicted of crimes." Five days later, Alton was transferred to Brockbridge Correctional Facility ("BBCF"), which Alton states is a violent and hostile prison reserved for minimum-security prisoners that does not have handicap accessible accommodations. At the time, Alton was classified at the lower security level of pre-release. ECF 1 at p. 3.

Alton alleges Defendants Warden Betty Johnson and Facility Administrator ("F.A.") Dionne Randolph are the supervisors in charge of BBCF and DRCF and, as such, are responsible for the abuse he experienced at both facilities at the hands of correctional staff. He claims the staff committing the abusive acts refused to provide their names, but involved a Major, two Lieutenants, and four Sergeants. He claims the first injury he suffered was a retaliatory transfer and that from April 18, 2014, through May 14, 2014, supervisory officials knew he was denied access to pain management medication as well as recreational activities including daily walks

2

while housed at BBCF.  Alton adds the supervisory staff also failed to intervene when Case Manager David Green and a Major denied reasonable modifications to accommodate Alton's physical disability and lack of mobility for purposes of his participation in a mandatory remedial drug treatment program, ATP.  ECF 1 at p. 3.

Alton states he could not get around BBCF without experiencing pain and "infliction of injury" due to the multiple flights of stairs he was forced to climb on a daily basis.  He alleges that the correctional officer named in his ARP ignored these conditions, made sarcastic remarks, and "abused [him] daily," culminating in his transfer from BBCF to Roxbury Correctional Institution ("RCI"), which is a medium security prison.  ECF 1 at p. 3.

On May 14, 2014, Alton states he was transported to the Central Booking and Intake Center en-route to RCI.  When he was transferred, he states he was forced to board a non-handicapped accessible bus.  He further alleges that when he arrived at Central Booking he was denied food for a period of five days and denied medication for four and one-half days because he could not walk one-quarter of a mile from his housing unit to the chow hall and medical dispensary.  He claims correctional officers under the supervision of Warden Michael J. Stouffer and Assistant Warden Denise A. Morgan subjected him to inhumane and hostile conditions, conspired with medical staff to falsify medical records, and destroyed or misplaced vital medical records.  ECF 1 at p. 3.

Alton states he attempted to exhaust administrative remedies, but Major Miller at RCI resolved the matter informally by transferring Alton to a handicap accessible housing unit.  Alton states housing unit one at RCI is accessible for the blind, but his assignment there was only temporary.  He adds that the wardens were given notice of the issue via an ARP filed on May 19,

2014, and through his verbal complaints to staff from May 14 through 21, 2014.  ECF 1 at pp. 3 – 4.

On May 22, 2014, Alton states he was transferred from RCI to Jessup Correctional Institution ("JCI").   He alleges he was again transported in a van that was not handicap accessible. He claims that Sgt. Wade forced him to climb difficult, narrow steps to board the bus and subjected him to verbal ridicule.  Alton claims Wade attempted to place him in an isolation cage on the bus normally reserved for segregation inmates.  When Alton refused because of the lack of leg and seating space, he claims Wade became irate and threatened to punch him in the face.  Alton further alleges that Wade referenced his frequent complaints and "dared" him to file a grievance against him. Other correctional officers present intervened on Alton's behalf, blocking Wade from assaulting Alton.  Alton states he sustained "visible injuries" to his legs, knees, and shins from climbing the steps.   Upon his arrival to JCI, Alton was placed in a handicap accessible cell.  ECF 1 at p. 4.

The following day, Alton arrived via DPSCS van at Eastern Correctional Institution ("ECI") where he was assigned to the Dorchester Unit dorms, which are not equipped with handicap accessible accommodations.  Alton alleges the assignment was a form of punishment or retaliation.  He states he suffered "injury" because the facility is not a pre-release unit and he was transferred to ECI against recommendations of case management staff at RCI, who canceled his assignment to ATP and assigned Alton to pre-release status.  Alton describes ECI as hostile and states he was denied showers.  Alton asserts that ECI Warden Kathleen Green and Facility Administrator Darryl Webster are responsible as supervisors for Lt. Drury, Captain Chester, and Sgt. Elliot.  He claims Green and Webster knew or should have known about the actions of case

management, but failed to intervene and "appeared to ignore [his] limitations and known disability for several months." ECF 1 at p. 4.

On June 5 and 6, 2014, Alton filed three ARPs concerning his conditions of confinement alleging violations of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and false imprisonment. He claims the administrative remedy coordinator, S. Gustus, improperly dismissed his claims concerning violations of the ADA and Rehabilitation Act and alleges she was engaged in a conspiratorial effort to deny Alton redress of his grievances. Alton states that while his ARPs were being investigated he was called to the medical department on "bogus passes" for the purpose of harassing and intimidating him. He claims that Webster, Drury, and Case Manager Scramlin participated in the harassment and intimidation. Specifically, he claims that Scramlin "threatened" that Alton could not be transferred from ECI until he completed the ATP; Drury ordered a search of his cell "without provocation or justification;" and Webster threatened him with administrative segregation or a transfer if he continued to file ARPs. ECF 1 at pp. 4 – 5.

On May 22, 2014,[1] Alton mailed legal documents to his attorney, Bert W. Kapinus, but his attorney claimed he never received the documents. On September 13, 2014, Alton received a package from a law firm, Wexler Wallace. Alton attempted to follow instructions from his attorney by returning legal forms via Federal Express, overnight delivery, but the mail was confiscated by Sgt. Witzke and Captain Holmes. Alton was given copies of the legal forms, but was not given the envelope based on a policy in place at ECI. Despite the policy, however,

---

[1]     The complaint notes this date as May 22, 2013, but from the context of the paragraph it appears that date is a typographical error. ECF 1 at p. 5, ¶ 7.

Alton claims he saw other inmates receive legal envelopes from the mailroom.[2]  Alton claims

that on December 25, 2014, Witzke mentioned the ARPs Alton had filed and threatened to have

him transferred.[3]  ECF 1 at p. 5.

On February 2, 2015, Alton filed an ARP complaining that mail from his father and his

aunt that included money orders for $20 and $15 were never received and were not returned to

the sender.  He states that Gustus improperly dismissed the ARP.  ECF 1 at pp. 5 – 6.

On March 9, 2015, Alton received legal mail from Special Prosecutor Thomas Krepp of

the United States Attorney General's Office in Atlanta, Georgia, informing Alton he may be a

victim of identity theft.  He claims this letter was mailed on November 14, 2014, and appeared to

be censored and copied by ECI prison officials.  ECF 1 at p. 6.

On January 8, 2015, Alton filed another ARP against Officer J. Wright alleging violations

of the ADA and the Rehabilitation Act because Alton was told to "move faster or run to class

like able bodied prisoners are capable of doing."  In addition, Alton alleges that all parties named

who were employed at ECI at the time knew or should have known that he would not be able to

complete ATP due to his imminent release date.  He states he repeatedly informed ECI staff of

this fact and also clearly explained that he is disabled due to a spinal cord injury with resultant

Brown Sequard Syndrome[4] as well as recurrent hernia, lower disc injury, and a hyper-extended

knee.  Alton alleges that he was maliciously required to attend ATP classes without regard to his

---

[2]   Alton states he witnessed two inmates, Jarrod Amos and Joshua Hinefelt, receive legal envelopes on December 23, 2014. ECF 1 at p. 5.

[3]   Alton appears to relate this claimed threat, which occurred in December, to an allegation that he was denied access to courts when he was not provided a legal envelope in May, seven months earlier.  ECF 1 at p. 5.

[4]   "Brown Sequard Syndrome is a rare spinal disorder that results from an injury to one side of the spinal cord in which the spinal cord is damaged but is not severed completely.  It is usually caused by an injury to the spine in the region of the neck or back. . . . Characteristically, the affected person loses the sense of touch, vibrations and/or position in three dimensions below the level of the injury."  See http://rarediseases.org/rare-diseases/brown-sequard-syndrome.

physical limitations and the unlikelihood of finishing the course because correctional staff wanted to continue to collect both state and federal funding for the program. He claims he attended the class under duress as he was threatened with the loss of diminution credits if he declined to go. ECF 1 at p. 6.

On February 10, 2015, Alton claims that Drury ordered Officers Nelson and Riggins to search his cell. ECF 1 at p. 6.

On February 17, 2015, Alton states he could not attend any meals due to ice and inclement weather. ECF 1 at p. 7.

On February 18, 2015, Drury harassed Alton in the dining hall during lunch, stating, "don't start no trouble it won't be none and don't file any lawsuits." ECF 1 at pp. 6 – 7.

On February 19, 2015, Alton claims Drury "taunted" him about his disability and bragged about winning acquittals in several lawsuits filed by both correctional staff and inmates. ECF 1 at p. 7.

On March 2, 2015, Alton states that Drury admitted he sent officers to Alton's cell to search it and told Alton he would have them destroy his cell again if he filed any type of grievance. Additionally, Alton claims that Drury made "sarcastic remarks" about Alton's disability and told Alton he could fix it so Alton would never get out of prison. ECF 1 at p. 7.

On March 5, 2015, Alton was told by Captain Fontaye and a traffic officer that he was scheduled to be released from DPSCS on the following day. Alton's intended home was located in Fayetteville, NC. On the day of his release, Alton was asked if he had made transportation arrangements and he was permitted to call his mother using a phone in the operations department. ECF 1 at p. 7.

7

Alton called his mother, who agreed to make arrangements with Alton's father and his aunt to pick him up from ECI on the morning of March 6, 2015 at approximately 5:00 a.m. Alton states his father drove four hours with hazardous road conditions to pick him up and that his mother drove four and one-half hours from North Carolina to meet Alton and his father. When Alton's father arrived at ECI, he was repeatedly told by Officers Banks, Corbin, and Powell that Alton would be released that day, but his father was required to wait for four additional hours. ECF 1 at p. 7.

Alton alleges that Officers Corbin and Powell as well as Capt. Chester, Lt. Cope, Sgt. Gains, and F.A. Webster told his father Alton would not be released for another ten days. Alton states he was told by Chester and Case Manager Ramsay that someone had mistakenly given Alton ten days of diminution credit to which he was not entitled. Alton claims that his release date was changed to March 16, 2015, because Ramsay recalculated his diminution credits and sent an email to DPSCS headquarters, resulting in an email from headquarters to the ECI Commitment Office where the new release date was entered on the computer system. ECF 1 at p. 7.

Alton claims that not only was the addition of ten days incorrect, he actually should have been released in 2013, but Defendants refused to obey the law or to correct the unspecified errors made. He states that the only initiative shown was to correct errors that extended his time in custody, not to reduce it. Although Alton states that Officers Banks and Simshauser and Capt. Fontaye attempted to intervene on his behalf to secure his release on March 6, 2015, he claims that Defendants Tyndall, Chester, Ramsay, Drury, Julie Webster, Hershberger, and Moyer either changed or conspired to change his release date. Alton claims he was "laughed at and humiliated

by Capt. Chester and CCMS II Ramsay" and alleges they have ulterior motives due to Alton's history of advocating for other inmates. ECF 1 at p. 8.

Alton returned to the Worcester housing unit and he was met by Officer Mister and Sgt. Elliott. He claims that Elliott yelled over the buildings outside and through the indoor intercom, "welcome back, your freedom was short lived." Alton claims that both Elliott and Mister began to "laugh uncontrollably" in the presence of other inmates. ECF 1 at p. 8.

On March 8, 2015, Alton states that Witzke induced panic attacks, with heart palpitations and shortness of breath, when he referred to Alton as Johnny Cochran and Al Sharpton. Alton adds that he has trouble sleeping longer than five to ten minutes and suffers with post-traumatic stress disorder (PTSD). ECF 1 at p. 9.

On March 10, 2015, Alton claims he explained to Chester what the problem was regarding his diminution of confinement credits and Chester declined to give him the name of the commitment personnel responsible for changing the information in the computer systems. Additionally, Alton asked Ramsay for the name of the commitment officer as well as the name of the supervisor responsible for changing the information and she too declined to give Alton the names. ECF 1 at p. 9.

Defendants state that on December 19, 2013, Alton was housed at ECI-Annex where the case management team recommended his transfer to BBCF, a pre-release facility. ECF 20 at Ex. 1, pp. 2 – 3. Pending his transfer, Alton made a request on March 11, 2014, to be transferred to Baltimore Pre-Release Unit ("BPRU"), because he understood that BPRU offered ATP. ECF 20 at Ex. 3, pp. 18 – 19. His request was denied because at that time Alton had more than 18 months to serve on his sentence. *Id.* Alton was instead transferred to DRCF on March 20, 2014. *Id.* at Ex. 2, p. 1. One week after his transfer to DRCF, Alton requested a transfer to Southern

Maryland Pre-Release Unit ("SMPRU"). *Id.* at Ex. 1, p. 2. Defendants do not offer an explanation as to why Alton's request was refused and state that Alton was instead transferred to BBCF on April 18, 2014. *Id.* On April 24, 2014, Alton was recommended for participation in ATP by BBCF case management. *Id.* at Ex. 1, p. 2. The recommendation was approved on May 2, 2014. *Id.*

Defendants submit a declaration under oath from Case Manager David Greene stating that BBCF is part of the pre-release system that offers ATP. According to Green, case management policy states that participation in a substance abuse treatment program is mandatory for all inmates who, like Alton, are deemed eligible. Enrollment is restricted to inmates who are within 24 months of an anticipated release date. Failure to complete the mandatory program does not, however, prevent release of an inmate who has reached his mandatory supervision release date. ECF 20 at Ex. 4, p. 2.

On May 5, 2014, after he was assigned to BBCF, a medical order was written for Alton's transfer because of his difficulty climbing stairs. ECF 20 at Ex. 11, p. 28. Alton submits as an exhibit a response from Case Management at BBCF dated May 8, 2014, signed by David Greene, which indicates that Alton assured Greene that he would have no problem handling the stairs at BBCF despite Greene's reservations. ECF 27-1 at p. 10, *see also id.* at p. 11. He states that Alton's request for a transfer is simply due to his dislike of the accommodations and his frustration that the ATP "did not start on the exact day that you expected it to start." *Id.* He further indicates that there are no ADA certified pre-release units that also offer the drug treatment programming he required, but that Alton would be transferred to an ADA certified facility that also offered the program. *Id.* An additional medical order dated April 22, 2014, also submitted by Alton, requires extra time and an escort for stair climbing, prohibits heavy lifting,

10

standing and sitting for prolonged periods of time, and requires assignment to a bottom bunk. ECF 27-1 at p. 13, *see also* ECF 20 at Ex. 11, p. 29.

On May 14, 2014, Alton was transferred to RCI and six days later a notation was made by case management staff that Alton should be transferred to a pre-release security facility. ECF 20 at Ex. 2, p. 1. On May 24, 2014, Alton was transferred back to ECI-Annex. *Id.* There is no documentation or evidence offered by Defendants indicating whether Alton was afforded all of the programming and benefits other pre-release prisoners are afforded while he was confined to ECI-Annex as a pre-release prisoner. Defendants do note that Alton was placed on the labor pool waiting list on June 3, 2014, and on July 1, 2014, Alton was assigned as an educational tutor. *Id.* at Ex. 3, pp. 3 – 5.

On November 5, 2014, Alton was seen by Dr. Howard Pinn of the East Mental Health Clinic at ECI on referral from medical care providers.[5]  At that time Alton was described as rational, polite, and cooperative, with no signs of delusional or hallucinatory thoughts. Dr. Pinn further observed that Alton, "appears to have a personality disorder which tends to distort the way he processes information to be very one sided. This narcissistic pattern was prevalent during the assessment." ECF 20 at Ex. 11, p. 69. Alton was informed as to how to access psychological services if needed. *Id.*

### Standard of Review

#### Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that
> there is no genuine dispute as to any material fact and the movant
> is entitled to judgment as a matter of law.

---

[5]     A medical record of the same date indicates that Alton presented with a high state of anxiety related to his belief that if he had a bowel movement he would "pass out and no one will be there to help him and then he will die." ECF 20 at Ex. 11, p. 71, *see also id.* at 74 (same complaint reported two days previously).

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.,* 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat,* 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt,* 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986)).

### Analysis

Exhaustion of Administrative Remedies

Defendants raise the affirmative defense of non-exhaustion and assert Plaintiff's claims that have not been properly presented through the administrative remedy procedure must be dismissed pursuant to 42 U.S.C. § 1997e. ECF 20. The Prisoner Litigation Reform Act provides, in pertinent part:

(a) Applicability of administrative remedies
No action shall be brought with respect to prison conditions under
section 1983 of this title, or any other Federal law, by a prisoner
confined in any jail, prison, or other correctional facility until such
administrative remedies as are available are exhausted.

42 U.S.C. § 1997e.

As a prisoner, Plaintiff is subject to the strict requirements of the exhaustion provisions.

It is of no consequence that Plaintiff is aggrieved by a single occurrence, as opposed to a general

condition of confinement claim. *See Porter v. Nussle*, 534 U.S. 516, 528 (2002) (no distinction

is made with respect to exhaustion requirement between suits alleging unconstitutional

conditions and suits alleging unconstitutional conduct). Exhaustion is also required even though

the relief sought is not attainable through resort to the administrative remedy procedure. *See*

*Booth v. Churner*, 532 U.S. 731, 741 (2001). A claim which has not been exhausted may not be

considered by this court. *See Jones v. Bock*, 549 U.S. 199, 220 (2007).

Administrative remedies must, however, be available to the prisoner and this court is

"obligated to ensure that any defects in administrative exhaustion were not procured from the

action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th

Cir. 2007). The Fourth Circuit has addressed the meaning of "available" remedies:

[A]n administrative remedy is not considered to have been available if a prisoner,
through no fault of his own, was prevented from availing himself of it. *See*
*Aquilar-Avellaveda v. Terrell*, 478 F. 3d 1223, 1225 (10th Cir. 2007); *Kaba v.
Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does not
exhaust all available remedies simply by failing to follow the required steps so
that remedies that once were available to him no longer are. *See Woodford v.
Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a
prisoner must have utilized all available remedies "in accordance with the
applicable procedural rules," so that prison officials have been given an
opportunity to address the claims administratively. *Id*. at 87. Having done that, a
prisoner has exhausted his available remedies, even if prison employees do not
respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

13

*Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008), *see also Blake v. Ross*, 787 F. 3d 693 (4th Cir. 2015), cert. granted *Ross v. Blake*, 136 S.Ct. 614 (2015) (review of whether there is a common law "special circumstances" exception to the PLRA that relieves mandatory obligation to exhaust administrative remedies where plaintiff erroneously believes exhaustion was satisfied through participation in an internal investigation).

Thus, Plaintiff's claims must be dismissed if Defendants raise the affirmative defense and also prove that Plaintiff has failed to exhaust available remedies. *See Jones*, 549 U.S. at 216 – 17 (failure to exhaust is an affirmative defense and inmates are not required to demonstrate exhaustion in their complaints).    The PLRA's exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase v. Peay*, 286 F. Supp. 2d 523, 530 (D. Md. 2003); *Booth*, 532 U.S. at 735 (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F. 3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

Three purposes underlie the PLRA's exhaustion requirement: "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219.   There are, however, exceptions to the exhaustion requirement. *See Moore*, 517 F. 3d at 725 (exhaustion

means providing prison officials with the opportunity to respond to a complaint through proper use of administrative remedies).

With regard to Alton's claims under the ADA and the Rehabilitation Act, Defendants admit Alton filed ARPs regarding accommodation of his disability, but appear to argue that he did not properly exhaust administrative remedies. Specifically, Alton filed an ARP on July 15, 2014, while confined to ECI-Annex stating that he was not transferred to a facility that was handicapped accessible when he was transferred to BBCF. ECF 20 at Ex. 6, pp. 26 – 27. The ARP filed by Alton specifically mentions the ADA, the Rehabilitation Act, and the concomitant denial of his access to programs. *Id.* The ARP was dismissed on July 28, 2014, on the reasoning that Alton was transferred to BBCF for participation in ATP; he was then transferred to RCI after he requested a transfer to a facility that was handicap accessible and offered ATP; and that Alton's security level was never increased as a result of any of the transfers. *Id.* at p. 28. Alton appealed the response on August 1, 2014, asserting the Warden's response was not credible, did not address all of the issues raised, and appeared to be based on erroneous information provided by Case Manager Greene. *Id.* at pp. 23 – 24. The appeal was dismissed. *Id.* at p. 25.

On June 4, 2014, Alton filed another ARP concerning allegations that he was denied programs and medical care due to the failure to accommodate his disability while he was incarcerated at RCI. The ARP was filed after Alton was transferred to ECI-Annex. ECF 20 at Ex. 9. Although all of the information contained in the ARP offered examples as to how Alton's rights under the ADA and the Rehabilitation Act were allegedly violated, his ARP was rejected with instructions to resubmit it and include only one issue. *Id.* at Ex. 9, pp. 3- 4. When Alton appealed this response he cited procedural errors in the rejection because it was not forwarded to RCI for investigation and he was not issued a receipt for the ARP within five working days. *Id.*

15

at p. 1. The appeal was dismissed on the rationale that it was erroneously accepted after Alton

did not comply with the instructions to resubmit it. *Id.* at p. 2. Alton filed an IGO complaint

concerning the alleged violations of the ADA and the Rehabilitation Act that occurred while he

was incarcerated at RCI; the complaint was dismissed as moot because Alton had been

transferred to ECI when the complaint was received. *Id.* at Ex. 10.

On June 5, 2014, Alton filed an ARP asserting he was denied access to the ATP,

medication, and recreational opportunities while confined at BBCF. ECF 20 at Ex. 9, pp. 15-16.

The ARP was again dismissed as containing multiple unrelated issues despite Alton's claim that

the denials were examples of violations of the ADA and the Rehabilitation Act. *Id.* at p. 15.

When Alton resubmitted the ARP he pointed out that it did not contain multiple unrelated issues

and that the only issue raised was denial of reasonable modifications to existing programs and

services pursuant to the ADA and the Rehabilitation Act. *Id.* at p. 14. The ARP was again

dismissed for failing to comply with the directions provided in the initial response. *Id.* Alton

filed an IGO complaint regarding his lack of access to programs and denial of reasonable

accommodations. *Id.* at Ex. 10. The IGO complaint was dismissed as moot because Alton had

been transferred to ECI. *Id.*

In light of the apparent refusal by correctional staff to address Alton's claims regarding

the violation of the ADA and the Rehabilitation Act, this Court finds those claims have been

exhausted. To the extent staff charged with the responsibility of investigating ARP complaints

are not equipped to address the sort of system-wide complaint raised by Alton, requiring him to

attempt to again have his claims investigated is futile. The ARPs and IGO complaints filed by

Alton were sufficient to allow Defendants an opportunity to investigate his claims, which they

declined, and the purpose of the exhaustion requirement is therefore fulfilled with respect to those claims.

With respect to the remaining claims raised, Alton filed ARPs regarding his diminution of confinement credits calculation and his mail. On June 6, 2014, Alton filed an ARP stating that his diminution of confinement credits were being miscalculated. ECF 20 at Ex. 9, pp. 5 – 6. The crux of his claim concerned his allegation he was denied certain credits earned for job assignments or certain housing assignments. *Id.* On June 24, 2014, the ARP was dismissed after an investigation and it was explained to Alton that the number of credits awarded were posted based on documentation received from Case Management as to the jobs or housing assignments he had been given. *Id.* at pp. 7, 9 – 11. Alton did not appeal the response. To the extent Alton attempts to raise a claim in this Court regarding an error in the calculation of his release date, it is both unexhausted and fails to state a federal claim. The merits of the claim regarding diminution of confinement credits shall be dismissed.

Alton filed two ARPs concerning his legal mail and his incoming mail. On September 13, 2014, he filed an ARP stating he attempted to mail documents to his attorney concerning a settlement by FedEx, overnight delivery, but the envelope was returned to him for "illegal" reasons. ECF 20 at Ex. 9, p. 17. Alton withdrew this ARP on October 29, 2014. *Id.* at p. 18.

On February 2, 2015, Alton filed an ARP stating he had been denied incoming mail from his relatives which contained money. ECF 20, Ex. 9, p. 19. An investigation was conducted and it was determined that no incoming mail for Alton was received during the time frame he referenced in the ARP (December 20 – 29, 2014), therefore he was not improperly denied access to mail. *Id.* at pp. 19 – 25. Alton did not appeal this response. Alton's claims regarding his mail are not exhausted and the merits of those claims will not be addressed by this Court.

Additionally, there is no evidence that Alton exhausted administrative remedies regarding his claims of retaliation; improper transportation between institutions; or unconstitutional conditions of confinement. The merits of those claims will therefore not be addressed herein and they will be dismissed.

ADA and Rehabilitation Act

To establish a prima facie case under Title II of the ADA or the Rehabilitation Act,[6] the plaintiff must show that: (1) he has a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities for which he was otherwise qualified; and (3) the exclusion, denial of benefits, or discrimination was by reason of his disability. *See Constantine v. George Mason Univ.,* 411 F.3d 474, 498 (4th Cir.2005); *Baird v. Rose,* 192 F.3d 462, 467 (4th Cir.1999). States are obligated to make "reasonable modifications" to enable the disabled person to receive the services or participate in programs or activities. 42 U.S.C. § 12131 *et seq.* A reasonable modification does not require the public entity to employ any and all means to make services available to persons with disabilities. Rather, the public entity is obligated to make those modifications that do not "fundamentally alter the nature of the service or activity of the public entity or impose an undue burden." *Bircoll v. Miami-Dade County,* 480 F.3d 1072, 1082 (11th Cir. 2007).

Title II of the ADA applies to any "public entity," including "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government," 42 U.S.C. § 12131(1), from discriminating "by reason of"

---

[6]  "The ADA and Rehabilitation Act generally are construed to impose the same requirements due to the similarity of the language of the two acts." *Baird ex rel. v. Rose,* 192 F. 3d 462, 463 (1999), citing *Rogers v. Department of Health, Envtl. Control,* 174 F.3d 431, 433-34 (4th Cir. 1999) (noting that it is appropriate to refer to constructions of the Rehabilitation Act in determining the meaning of an ADA provision). "Congress has directed courts 'to construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act.'" *Id.,* quoting *Bragdon v. Abbott,* 524 U.S. 624 (1998).

disability against a "qualified individual with a disability." *Id.* § 12132.[7] The term "public entities", includes the Maryland DPSCS, *see id.* § 12131(1), which are prohibited from discriminating "by reason of" disability against a "qualified individual with a disability." *Id.* § 12132.

A "qualified individual with a disability" is a person with a disability "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). State prisoners, like Alton, may qualify as "qualified individual[s] with . . . disabilit[ies]," *id.*, so as to come within the protection of Title II of the ADA. *See Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 213 (1998), (holding that "the plain text of Title II of the ADA unambiguously extends to state prison inmates."). The language of the statute is all-inclusive and Title II of the ADA applies to everything a public entity does. *See Seremeth v. Bd. of County Comm'rs of Frederick County*, 673 F.3d 333, 338 (4th Cir. 2012). This Court has observed that "[t]here is no textual limitation requiring that a plaintiff must demonstrate some other source of legal entitlement to participation in the program or activity at issue in order to proceed under either statute. Rather, it is enough that the plaintiff is excluded from participation in or denied the benefits of the program on the basis of disability." *Jarobe v. Maryland Dept. of Public Safety and Correctional Services, et al.*, ELH-12-572 (D. Md. 2012), ECF 49 at p. 34.

Defendants do not dispute, and the records submitted support the fact, that Alton suffers from Brown Sequard Syndrome, requiring him to walk with crutches and wear braces on his

---

[7]    Title I of the ADA prohibits discrimination against individuals with disabilities in employment. *See id.* §§ 12111 *et seq.* Title III applies to public accommodations. *See id.* §§ 12181 *et seq.*

legs. In addition, there is acknowledgment that Alton required accommodations for his disability such as assignment to a lower bunk and assistance with walking long distances or negotiating stairs. The medical record also supports a finding that Alton suffers a chronic pain condition emanating from spinal disc disorders. *See generally* ECF 20 at Ex. 11. Alton is a disabled person entitled to the protections provided under the ADA.

Title II of the ADA also applies to Alton's participation in the ATP, work release, and any diminution of confinement credits he may have been entitled to by virtue of his participation. It is undisputed that Alton could not participate in a program DPSCS designated as "mandatory" at a facility that was also a pre-release prison. What remains unclear, because Defendants have not addressed it, is whether Alton was denied the opportunity to participate in yet another program, work release, because of his disability and whether Alton was then denied the benefit of earning additional diminution of confinement credits because of his disability. Defendants have only addressed Alton's claim under the ADA and the Rehabilitation Act in terms of the medical care he received. A fair reading of the Complaint does not lead this Court to the conclusion that he was raising that claim.

Moreover, the mere fact that Alton was not constitutionally entitled to participate in prison programs or to earn the benefits derived therefrom, *i.e.*, diminution of confinement credits, is not dispositive of his claim under Title II of the ADA or the Rehabilitation Act. Alton has alleged that DPSCS receives federal funding for its ATP program, bringing participation in that program within the ambit of the Rehabilitation Act's protection.

Under 29 U.S.C. §794(b) a "program or activity" from which a disabled person may not be excluded solely on the basis of that disability is defined as follows:

[A]ll of the operations of—

(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

(B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a *State or local government . . . any part of which is extended Federal financial assistance.*

*Id.* (emphasis supplied). Thus, the DPSCS is subject to the proscriptions of the Rehabilitation Act if there is evidence the department receives federal financial assistance. While Alton has not produced any evidence that the Maryland DPSCS receives federal funding for the ATP, Defendants have offered nothing to refute that allegation and the record is currently devoid of evidence upon which this Court may rely to determine if the Rehabilitation Act even applies to Alton's claim regarding the ATP. The record does not, however, support a conclusion that Alton was excluded from participation in the ATP solely because of his disability. Alton participated in the ATP, albeit his participation was delayed by efforts to locate him in a prison where it was offered and in which he could be accommodated for his disability. What remains unclear, however, is whether Alton was excluded from participation in work release solely because of his disability and thereby excluded from receipt of diminution of confinement credits, or if his assignment as a tutor garnered the same or similar benefits as a work release assignment. Summary judgment must be denied on Alton's ADA and Rehabilitation Act claims.

While it is true, as Defendants assert, that denial of medical care alone is not enough to establish a violation of the ADA,[8] Alton's claim appears to differ from the claims asserting

---

[8]     *See, e.g. Miller v. Hinton,* 288 Fed. Appx. 901 (4th Cir. 2008) (prison's alleged denial of access to colostomy bags and catheters by inmate, who was a paraplegic confined to a wheelchair who used such supplies for urinary bladder control, did not constitute disability discrimination in violation of ADA absent a showing that inmate was treated in that manner because of his disability); *Spencer v. Easter,* 109 Fed. Appx. 571, 573 (4th Cir. 2004) (failure to provide timely refills of prescription drugs did not amount to an ADA violation where there was no showing that it was done based on prisoner's disability).

denial of access to specific medical care.  A fair construction of the claims raised by Alton, both in the Complaint filed in this Court and his ARPs, is that he was denied access to medical care because he could not walk the distance required to get to the area of the prison where medical care was provided.  Alton raised this claim with respect to his confinement at BBCF and RCI. Defendants have not addressed this claim, therefore, summary judgment must be denied.

The parties will be required to file supplemental pleadings addressing Alton's ADA and Rehabilitation Act claims in light of the analysis stated herein.  A separate Order follows.


March 10, 2016                                  /s/
Date                                           William M. Nickerson
                                               Senior United States District Judge